IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

**JEFORY MASHBURN, On Behalf of
Minor CM, JOSEPH CORNELISON,
On Behalf of Minor RC,
NATHANAEL WILLIAMS,
AMY HINMON, JOSEPH LEWIS,
individually and on behalf of a
class of all others similarly situated,**

         Plaintiffs,

   v.

**YAMHILL COUNTY,
TIM LOEWEN,
both individually and in his
official capacity as Director,
CHUCK VESPER,
both individually and in his
official capacity as Division
Manager,**

         Defendants.

CV 08-718-HU
AMENDED OPINION & ORDER

**MOSMAN, J.**,

     Plaintiffs are or were minors who were strip searched upon entry into the Yamhill County

Juvenile Detention Center ("YCJDC") and after "contact visits" with non-YCJDC staff members,

including their own lawyers. Plaintiffs sued Yamhill County, Tim Loewen, the Yamhill County

Director, and Chuck Vesper, the Yamhill County Division Manager under 42 U.S.C. § 1983,

alleging that the YCJDC strip search policy is unreasonable under the Fourth Amendment. The

parties filed cross-motions for summary judgment that centered on the constitutionality of the

YCJDC strip search policy.

Magistrate Judge Hubel heard oral argument on both motions and issued Findings and Recommendation ("F&R") (#60) on December 4, 2009. He concluded the "blanket" strip searches upon entry to the detention facility were constitutional, but the post-contact-visit strip searches during detention were not. Despite finding that post-contact-visit strip searches violated plaintiffs' Fourth Amendment rights, Judge Hubel recommended that Mr. Loewen and Mr. Vesper be granted qualified immunity because plaintiffs' rights had not been clearly established. The parties filed objections to the F&R, as well as responses to the other parties' objections.

Upon review, I agree with Judge Hubel's recommendation as to qualified immunity, plaintiffs' standing to seek an injunction, and the unconstitutionality of the post-contact-visit strip searches. I further find that the scope of the admission search policy is excessive in relation to the government's interest and therefore unconstitutional.

## I.    **Factual Background**

As Judge Hubel observed, "the strip searches authorized by the [YCJDC] policies are highly intrusive, as the juveniles are completely unclothed for inspection by a stranger, are required to manipulate either their breasts or scrotum for inspection, and to squat and cough." (F&R (#60) 16-17.) Moreover, the entire search, including inspection of the minor's hair, mouth, hands, arm pits, and feet, is conducted while the minor is completely unclothed. (*Id.* at 4-6; Kraemer Aff. (#29) Ex. 1; Berman Decl. (#27) Ex. 1.)

YCJDC policy authorizes staff members to conduct strip searches after a juvenile is admitted to the detention center. The detention center has a detailed intake policy that evaluates a juvenile's charged crime, criminal history, physical and mental well-being, and the behavior

PAGE 2 AMENDED OPINION AND ORDER

giving rise to the juvenile's arrest. (Kraemer Aff. (#29) Ex. 2-3.) A juvenile may only be admitted

if the juvenile: (a) is the subject of a court order to detain; (b) is the subject of a Circuit Court

statewide or nationwide warrant; (c) violated conditions of probation; (d) violated conditions of

conditional release; (e) allegedly committed a felony; (f) allegedly possessed a firearm

unlawfully; (g) allegedly committed the offense of Criminal Manufacture or Delivery of a

Controlled Substance; (h) committed a misdemeanor resulting in physical injury; (i) is a fugitive

from another jurisdiction; or (j) wilfully failed to appear at a juvenile court proceeding. (F&R

(#60) 4; Kraemer Aff. (#29) Ex. 2.) In addition to one of these factors, the juvenile must also be

either a flight risk or engaged in behavior that endangers herself, others, or the community. (*Id.*)

    The detention center policy also authorizes strip searches after "contact visits" with non-

YCJDC staff. Contact visits take place in an open room and are only permitted when the visitor

is professional, such as an attorney or mental health counselor. Personal visitors, such as parents

or guardians, are allowed only non-contact visits in which the visitor and the juvenile are

physically separated by a glass partition. The YCJDC policy does not authorize strip searches

after non-contact visits.

## II.    <u>Standard of Review</u>

    The magistrate judge makes only recommendations to the court, to which any party may

file written objections.  The court is not bound by the recommendations of the magistrate judge,

but retains responsibility for making the final determination.  The court is generally required to

make a *de novo* determination of those portions of the report or specified findings or

recommendation as to which an objection is made.  28 U.S.C. § 636(b)(1)(C).  However, the

court is not required to review, under a *de novo* or any other standard, the factual or legal

PAGE 3 AMENDED OPINION AND ORDER

conclusions of the magistrate judge as to those portions of the F&R to which no objections are addressed.  *See Thomas v. Arn*, 474 U.S. 140, 149 (1985); *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003). While the level of scrutiny under which I am required to review the F&R depends on whether or not objections have been filed, in either case, I am free to accept, reject, or modify any of the magistrate judge's F&R.  28 U.S.C. § 636(b)(1)(C).

III.    **Evaluating the Reasonableness Under the Fourth Amendment**

Plaintiffs allege that the YCJDC strip search policy violates their Fourth Amendment right to be free from "unreasonable searches and seizures." U.S. Cont. amend. IV. "Here, the policies at issue involve a full strip search of juveniles upon their admission to YCJDC and after contact visits with non-Juvenile Department staff, without any requirement for reasonable suspicion to suspect the juvenile possesses contraband." (F&R (#60) 16.) This factual scenario raises two key questions that bear on the constitutionality of the policy. The first question is whether the search is justified at its inception; that is, whether it is reasonable under the Fourth Amendment for the government to perform a strip search without individualized suspicion. The second question is whether the scope of the search is reasonable; that is, whether the government's "need for the particular search" outweighs "the invasion of personal rights that the search entails." *See Bell v. Wolfish*, 441 U.S. 520, 559 (1979).

A.    *Whether the Search is Justified at its Inception*

The Fourth Amendment generally requires searches to be conducted pursuant to probable cause, or at least "some quantum of individualized suspicion." *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 619, 624 (1989). But, "in certain limited circumstances, the Government's need to discover such latent or hidden conditions, or to prevent their development, is sufficiently

PAGE 4 AMENDED OPINION AND ORDER

compelling to justify the intrusion on privacy entailed by conducting such searches without any measure of individualized suspicion." *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 668 (1989). These cases, commonly referred to as "special needs" cases, ask whether a government need, "beyond the normal need for law enforcement, make[s] the warrant and probable-cause requirement impracticable." *Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie County v. Earls*, 536 U.S. 822, 829 (2002) (internal quotations omitted).

For example, special needs cases frequently arise in the context of public schools, where the Fourth Amendment "reasonableness" standard is influenced by "the schools' custodial and tutelary responsibility for children." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 656 (1995). These cases reflect the understanding that "[a] student's privacy interest is limited in a public school environment where the State is responsible for maintaining discipline, health, and safety." *Earls*, 536 U.S. at 830.

Fourth Amendment challenges in the context of prisons and jails are not typically referred to as special needs cases, but the Supreme Court and Ninth Circuit have upheld prison searches predicated on less than probable cause, or even reasonable suspicion. In particular, the Supreme Court and Ninth Circuit have upheld suspicionless strip searches of arrestees who were confined in a prison's general population. *See Wolfish*, 441 U.S. at 558-560; *Bull v. City and County of San Francisco*, Nos. 06-15566, 05-17080, ___ F.3d ___, 2010 WL 431790, at *13-14 (9th Cir. Feb. 9, 2010) (en banc). In those cases, the search policies were deemed reasonable in light of the government interest in maintaining the institutional security of a prison. *Wolfish*, 441 U.S. at 560; *Bull*, 2010 WL 431790, at *5, 8-9.

PAGE 5 AMENDED OPINION AND ORDER

      **B.**    *Whether the Scope of the Search is Reasonable*

A government's special need does not, in and of itself, validate a search. *Earls*, 536 U.S. at 830. Rather, after finding a special need, a court will consider whether the government's "need for the particular search" outweighs "the invasion of personal rights that the search entails." *See Wolfish*, 441 U.S. at 559. In other words, even though a special need may allow YCJDC to conduct searches without individualized reasonable suspicion, the search may still be unconstitutional if it is excessively intrusive in relation to the government's need for the search.

In schools, for example, even though a student has a reduced privacy interest and the government has a special need to conduct searches based on less than probable cause, the scope of the search must not be "excessively intrusive in light of the age and sex of the student and the nature of the infraction." *New Jersey v. T.L.O.*, 469 U.S. 325, 342 (1985). Applying the *T.L.O.* standard, the Supreme Court recently held that a strip search of a student alleged to have given over-the-counter pain medication to other students was unconstitutional, even though the school official had reasonable suspicion to search the student. *Safford Unified Sch. Dist. #1 v. Redding*, 129 S. Ct. 2633, 2642-43 (2009). In light of the intrusive and potentially damaging nature of a strip search, it was unreasonable for the school officials to conduct a strip search without information that the medication posed a danger to other students and that the student was carrying the pills in her underwear. *Id.*

**IV.**   **The Constitutional Standard Governing Strip Searches in Juvenile Detention Facilities**

Neither the Supreme Court nor the Ninth Circuit has directly ruled on the constitutionality of strip searches conducted on juvenile detainees. On the constitutional spectrum, the standard

for analyzing strip searches of children at the YCJDC falls somewhere between the standards that

govern searches of adult prison inmates and searches of school children.[1]

Unlike students, "youth confined in a juvenile detention facility are 'under substantially

greater restraint and ha[ve] a lesser expectation of privacy than do students.'" (F&R (#60) 13

(quoting *Reynolds v. City of Anchorage*, 379 F.3d 358, 364 (6th Cir. 2004)).) Conversely,

standards that apply in the context of an adult prison strip search are not directly transferrable to

juvenile detention searches because "[s]trip searches of children pose the reasonableness inquiry

in a context where both the interests supporting and opposing such searches appear to be greater

than with searches of adults." *N.G. v. Connecticut*, 382 F.3d 225, 232 (2d Cir. 2004); *see also*

*May v. Anderson*, 345 U.S. 528, 536 (1953) (Frankfurter, J., concurring) ("Children have a very

special place in life which law should reflect. Legal theories . . . lead to fallacious reasoning [if]

uncritically transferred to determination of a State's duty towards children"). Specifically, the

State's exercise of legitimate custodial authority over the child gives the State a heightened

interest in caring for detained children, which must be balanced against the child's more acute

vulnerability to the intrusiveness of a strip search. *N.G.*, 382 F.3d at 232. Moreover, the power

differential always present between a guard and a prisoner is greatly magnified when the "guard"

is an adult and the "prisoner" is a child. A juvenile detention facility also has different

penological interests, in light of the fact that some juveniles are admitted to a detention facility

---

[1]  The parties requested leave to file supplemental briefing on *Bull*, 2010 WL 431790, which was decided while the motions in this case were under advisement. I denied leave both because I am familiar with the *Bull* decision and its potential applicability to this case and because I did not think that further briefing would be helpful or necessary. *Bull* is binding precedent with respect to strip searches conducted in prisons, but *Bull*'s reasoning is distinguishable in the context of juvenile detention facilities.

without having committed conduct that would constitute a crime. (*See* Kraemer Aff. (#29) Ex. 2); *see also N.G.*, 382 F.3d at 235. Accordingly, the unique concerns of children and of the government, which have analogies in both prisons and schools, frame my analysis of YCJDC's search policy.

## V.    Are the YCJDC Strip Searches Justified at Their Inception?

Plaintiffs challenge the constitutionality of conducting strip searches without reasonable suspicion any time a juvenile is admitted to YCJDC or engages in a contact visit. I conclude that defendants have shown two important interests that justify conducting some form of suspicionless search. First, like a teacher in a public school, defendants act as guardians to the children in the detention facility. This guardianship status gives rise to special responsibilities and obligations to care for and protect detained children. Second, as in a prison, defendants have an interest in maintaining the security of the detention facility.

With respect to strip searches at admission, the YCJDC policy could be unconstitutional as applied to juvenile admittees whose conduct or reason for admission does not raise security concerns. But all of the plaintiffs in this case engaged in conduct that created concern about whether they would introduce drugs or weapons into the detention facility, thereby justifying the strip search at its inception. With respect to strip searches after contact visits, however, the policy is unconstitutional because YCJDC has not shown that its institutional interests justify suspicionless searches.

### A.    *Admission Searches*

#### 1.    The Constitutionality of the Policy

Judge Hubel reasoned that the YCJDC intake process and admission criteria reflected

PAGE 8 AMENDED OPINION AND ORDER

Yamhill County's efforts to ensure that a search was not unreasonable in light of a child's individual characteristics. (F&R (#60) 19-20 (noting that the YCJDC "gathers information regarding the juvenile's medical and criminal history, whether the juvenile has a history of abuse or suicide, and the circumstances surrounding the immediate arrest, including the juvenile's demeanor.").) Defendants further note that the YCJDC "admission criteria provide that only juveniles who have committed crimes for which they could be strip searched if they were adults, are even lodged at the facility, with few exceptions, if any." (Defs.' Resp. (#73) 3.) But the YCJDC intake process and admission criteria, however thorough or stringent, means little to the constitutional analysis in this case absent a relationship between the factors that influence admission and the factors that create a government need to strip search juvenile detainees.

Even assuming that the YCJDC intake process evaluates each juvenile's charged conduct, mental and physical health, and circumstances of arrest, defendants have not shown that the criteria for admission to YCJDC bear a reasonable relationship to the facility's institutional security concerns. For example, if a juvenile commits an armed robbery, YCJDC may admit the juvenile because he is charged with a violent felony and may be a danger to others. In that case, the factor that drives the government to detain the juvenile—community safety—is the same factor that creates an institutional interest in strip searching him. But the YCJDC policy also allows juveniles to be admitted to the detention facility for failing to appear for a court hearing, disobeying a court order, or being a fugitive from another jurisdiction. (F&R (#60) 4.) In these cases, the factors that support detention are not the same as the factors that support a strip search. The fact that juvenile runaways and truants may be admitted to juvenile detention facilities is one of the reasons that the constitutional standards governing adult prison searches are not directly

PAGE 9 AMENDED OPINION AND ORDER

applicable in the context of juvenile detention facilities. *See N.G.*, 382 F.3d at 235 ("No doubt a

state has a legitimate interest in confining such juveniles in some circumstances, but it does not

follow that by placing them in an institution where the state might be entitled, under *Turner*, to

conduct strip searches of those convicted of adult-type crimes, a state may invoke *Turner* to

justify strip searches of runaways and truants."). On the face of the YCJDC policy, some

juveniles are admitted and strip searched for reasons that would not result in adult incarceration,

or that do not raise serious community safety concerns. In those cases, a strip search would not be

constitutional without reasonable suspicion.

### 2.    The Constitutionality of Searches of Individual Plaintiffs

A strip search is designed to meet the institution's security concern that drugs and

weapons will be introduced into the detention facility. Ideally an institution would search only

those juveniles whose underlying conduct involved drugs or a weapon. But I cannot assume on

this record that YCJDC has the resources or opportunity to make accurate factual findings

regarding the actual conduct of an admitted juvenile, as opposed to categorical distinctions based

on the juvenile's charges. Absent evidence that YCJDC could rely on readily ascertainable facts

about each juvenile's background upon admission, it is appropriate for the facility to make

determinations about the likelihood of smuggling drugs or weapons based solely on categories of

charged conduct.

Judge Hubel observed that, with the exception of Ms. Hinmon, "each of the named

plaintiffs was charged with a crime that included an element of force or had a criminal history

that included such a charge." (F&R (#60) 19 n.5.) Plaintiff Nathaniel Williams was arrested on

charges of Robbery in the Third Degree,[2] plaintiffs CM and RC were arrested on charges of

Sexual Abuse in the First Degree,[3] and plaintiff Joseph Lewis had a prior arrest for carrying a

concealed weapon.[4] (*Id.* at 7-8.) Ms. Hinmon was admitted for failure to complete a drug and

alcohol evaluation, a charge which raised concern about whether she would introduce drugs or

alcohol into the facility. (*See id.* at 7.)

    Given the nature of these charges, the government interest leans more toward the adult

prison side of the continuum. In *Bull*, the Ninth Circuit made clear that the balance between the

institutional need for some form of strip search and the intrusiveness of a visual body-cavity

search "must be resolved in favor of the jail system's institutional concerns," at least where an

arrestee is classified for housing in the general population of the jail or prison. 2010 WL 431790,

at *9, 14. Even taking into account the heightened concerns of the children being subjected to a

strip search, I conclude that it was reasonable for Yamhill County to conduct a strip search of the

named plaintiffs in light of the institutional security concerns raised by the charged conduct and

juvenile criminal history known to YCJDC staff at the time of the search.

    **B.    *Contact Visits***

    I agree with Judge Hubel that it is unconstitutional to strip search juveniles after contact

visits and without individualized suspicion that the juvenile has acquired contraband. Because

contact visits occur primarily between the juvenile and his or her attorney, the repetitive strip

---

    [2]  Under ORS 164.395, Robbery in the Third Degree requires a person to "use[ ] or
threaten[ ] the immediate use of physical force upon another person."

    [3]  Under ORS 163.427, Sexual Abuse in the First Degree may be committed if a pseron
subjects another person to sexual contact through forcible compulsion.

    [4]  *See* Kraemer Aff. (#29) ¶ 7 & Ex. 5.

PAGE 11 AMENDED OPINION AND ORDER

searches at YCJDC burden not only the juvenile's privacy interests, but also the juvenile's right to counsel. One of the plaintiffs in this case, Ms. Hinmon, was admitted to YCJDC on charges of Failure to Appear on a Minor in Possession charge and Contempt of Court for Failing to Complete a Drug/Alcohol Evaluation. (F&R (#60) 8.) She was strip searched four times in six days—once upon admission to YCJDC and three more times after meeting with her attorneys. (*Id.* at 8.) CM and RC, plaintiffs who were arrested on charges of Sexual Abuse in the First Degree, were searched five times and eight times, respectively, over the course of five days. (*Id.*) It is not hard to imagine a juvenile like Ms. Harmon begging her attorney not to come visit her again, lest she be subjected to an $N^{th}$ strip search. Nor is it any better to envision a troubled young person declining to visit with her therapist for the same reason.

In contrast to the heightened interests of children subjected to repetitive post-contact visit searches, Yamhill County's interests are reduced. Juveniles are only permitted contact visits with visitors who are extremely unlikely to provide a juvenile with drugs or weapons, and, in most cases, a strip search will already have occurred when the juvenile was admitted to the detention facility. Because the child's privacy and other constitutional interests are heightened, and the government's interests are reduced, YCJDC's general security and custodial interest are not sufficient to outweigh the intrusiveness of the strip search.

## VI.    Is the Scope of the Admission Search Reasonable?

In order for the search to be reasonable under the Fourth Amendment, the government's demonstrated need must outweigh the harm caused by the search. I have found that maintaining institutional security and protecting detained children are legitimate government interests justifying—at their inception—these particular strip searches. But a search that is justified as an

PAGE 12 AMENDED OPINION AND ORDER

initial matter can nevertheless be executed in such a manner as to lose its initial constitutional protection. *See Redding*, 129 S. Ct. at 2642-43 (holding that "the content of the [searcher's] suspicion failed to match the degree of intrusion"); *see also Wolfish*, 441 U.S. at 559 ("Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted."); *Illinois v. Caballes*, 543 U.S. 405, 407 (2005) ("[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution."); *United States v. Ramirez*, 523 U.S. 65, 71 (1998) ("Excessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment, even though the entry itself is lawful and the fruits of the search are not subject to suppression."). And, on this record, I hold that defendants have not shown a reasonable relationship between their legitimate interests and the scope of the strip searches conducted at YCJDC.

### A.     *Intrusiveness*

The strip searches conducted on children detained at YCJDC are unquestionably intrusive. Children and adults have a right to bodily privacy in part because "[t]he desire to shield one's unclothed figure from [the] view of strangers . . . is impelled by elementary self-respect and personal dignity." *York v. Story*, 324 F.2d 450, 455 (9th Cir. 1963). For this reason, a strip search is the kind of search that "instinctively gives [courts] the most pause." *Wolfish*, 441 U.S. at 558. Various circuit courts have described strip searches as "a serious intrusion upon personal rights," *Justice v. City of Peachtree City*, 961 F.2d 188, 192 (11th Cir. 1992); "an offense to the dignity of the individual," *Burns v. Loranger*, 907 F.2d 233, 235 n.6 (1st Cir. 1990), and "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, [and] repulsive,"

*Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1272 (7th Cir. 1983) (quotation and citation

omitted). Strip searches of children raise unique concerns, since youth "is a time and condition of

life when a person may be most susceptible to influence and to psychological damage." *Eddings*

*v. Oklahoma*, 455 U.S. 104, 115 (1982); *see also Redding*, 129 S. Ct. at 2641 (evaluating the

reasonableness of a strip search in light of "adolescent vulnerability [that] intensifies the patent

intrusiveness of the exposure"); *N.G.*, 382 F.3d at 239 (Sotomayor, J., dissenting) (noting that

"[c]hildren are especially susceptible to possible traumas from strip searches," particularly when

they are victims of sexual abuse) (quoting *Eddings*, 455 U.S. at 115).

And the strip searches conducted at YCJDC are more intrusive than most. For example,

they are not brief. <u>After</u> the minor removes all of his or her clothing, a YCJDC staff member:

1.      Inspects the child from top to bottom;

2.      Inspects the minor's hair;

3.      Inspects the minor's ears;

4.      Inspects the minor's mouth, including requiring the child to lift her upper and
        lower lips and run her fingers between her teeth and gums;

5.      Requires the minor to blow each nostril, one at a time;

6.      Inspects the minor's hands;

7.      Inspects the minor's armpits;

8.      Inspects a girl's breasts or a boy's testicles;

9.      Requires the minor to squat and cough;

10.     Requires the minor to face the wall so staff can inspect the back of the minor's
        body; and

PAGE 14 AMENDED OPINION AND ORDER

11.    Inspects the minor's feet, including in between the toes.

(Kraemer Aff. (#29) Ex. 1 at 2-4.) The minor is allowed to put on his or her clothes only after all

of these steps have been completed. (*Id.*) The duration of this multi-step search, and the

corresponding length of time in which a juvenile stands fully exposed and subject to inspection,

makes this search particularly demeaning.

The YCJDC strip searches are also, to put it charitably, astonishingly thorough. A boy is

required "to lift his scrotum so that staff can inspect the area directly below the testicles."

(Kraemer Aff. (#29) Ex. 1 at 2.) If a boy is uncircumcised, "he is instructed by staff to pull back

the foreskin so that the area beneath the foreskin can be inspected." (*Id.*) Girls are required to lift

their breasts "so that staff can inspect the area directly below." (*Id.* at 4.)

YCJDC could mitigate the length and intensity of its strip searches by taking steps to

ensure that the child is not fully exposed for longer than is reasonably necessary to accomplish its

search objectives. But aside from moving the child to private area, YCJDC makes no extra effort

to preserve the privacy and dignity of the searched child. For example, a child spends the entire

search completely naked even though a majority of the time-consuming steps described

above—including searches of hair, ears, mouth, nose, hands, armpits, and toes—do not require

complete nudity. The intrusiveness of these strip searches stands in contrast to other searches of

juveniles that have been held constitutional and that did indicate extra effort to preserve the

privacy and dignity of the searched child. For example, in *Smook v. Minnehana County*, the

Eighth Circuit found it material that the detention center staff required a juvenile to undress only

to her undergarments, which "placed her at the same level of undress as if she were at the beach

in a swimsuit." 457 F.3d 806, 811-12 (8th Cir. 2006) (internal quotation and citation omitted).

PAGE 15 AMENDED OPINION AND ORDER

Likewise, in *Reynolds v. City of Anchorage*, each detained girl was instructed "to remove her blouse and bra, put them back on, and then to remove her bottom clothing and underwear and bend over to allow a visual inspection of her rectal area." 379 F.3d at 361. Even the juveniles subjected to the highly invasive strip searches at issue in *N.G. v. Connecticut* may have been provided robes during the search at issue. *See* 382 F.3d at 228 (noting that the strip search policy was amended in 2002, after plaintiffs were searched, to deauthorize visual inspections of a juvenile's vaginal and anal body cavities, but not indicating whether use of robes predated the 2002 policy amendment).

### B.    *The Relationship Between the Government Interest and Scope of the Strip Search*

Defendants raise valid concerns about their obligations to care for and protect juveniles who are admitted to YCJDC. But the existence of that need, in and of itself, says little about the reasonableness of the search under the Fourth Amendment because a search may be too intrusive in light of the underlying interests justifying it. Accordingly, it is appropriate to ask whether there is a "valid, rational connection between the . . . regulation and the legitimate governmental interest put forward to justify it." *See Turner v. Safley*, 482 U.S. 78, 89 (1987) (internal quotation omitted) (evaluating the constitutionality of regulations in adult prisons). Even accepting that defendants' concerns are legitimate, the record does not show that a highly invasive strip search bears a reasonable relationship to the interests defendants identified.

Charles Vesper, Division Manager for the Yamhill County Juvenile Corrections Division, stated that the admission strip searches at YCJDC "have recovered drugs, contraband and other illegal items during unclothed searches of juveniles who are admitted into YCJDC." (Vesper Aff.

PAGE 16 AMENDED OPINION AND ORDER

(#21) ¶ 9.)[5] In Mr. Vesper's opinion, "[m]ost, if not all of these items would not have been discovered during a normal, clothed pat down search." (*Id.*) Mr. Vesper also asserts that "the period of time when the person is completely unclothed is no longer than is reasonably necessary to complete the search." (*Id.* at ¶ 6.)

There is a lot of space on the continuum between a fully-clothed pat-down search and the thorough strip search conducted pursuant to YCJDC policy, however, and Mr. Vesper fails to explain why it is "reasonably necessary" to perform a search of a juvenile's hair while the juvenile is completely undressed. Even assuming that a fully-clothed pat-down search would not reveal contraband, nothing in Mr. Vesper's affidavit demonstrates these harms could not be discovered in a search that is more extensive than a fully-clothed pat-down search but less intrusive than a lengthy and intrusive strip search. There are several less intrusive alternatives to the YCJDC policy that would not jeopardize the State's legitimate interests. For example, YCJDC could search juveniles while they are wearing underwear, could give them a robe or gown, or could perform the mouth, hair, arms, and feet inspection while the children were partially or fully clothed. In the context of adult prisons, "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated

---

[5]  Plaintiffs filed a motion to strike Mr. Vesper's affidavit on the grounds that his testimony relies on hearsay and lacks personal knowledge. (Mot. to Strike (#67) & Mem. in Supp. of Mot. to Strike (#68).) Mr. Vesper's affidavit was filed with defendants' Motion for Summary Judgment (#18) on June 8, 2009. Plaintiff's motion to strike was filed on January 15, 2010, seven months after Mr. Vesper's affidavit was filed and over a month after Judge Hubel issued findings and recommendation on defendants' Motion for Summary Judgment. Accordingly, I find that plaintiffs have waived their objections to Mr. Vesper's affidavit, and I DENY plaintiffs' Motion to Strike (#67).

PAGE 17 AMENDED OPINION AND ORDER

response' to prison concerns." *Turner*, 482 U.S. at 90.[6]

The existence of less intrusive alternatives is more compelling in the context of a juvenile detention facility than in a prison. Even though the privacy interest of a detained juvenile is less than that of a student, the Constitution still requires some showing that the scope of the search is reasonable in light of a child's acute vulnerability. Here, far from presenting evidence that the scope of a strip search is a reasonable means of furthering institutional security interests, the YCJDC has presented only vague references to "incidents" in which "drugs, contraband and other illegal items" were discovered during strip searches. (*See* Vesper Aff. (#21) ¶ 9.) Defendants have provided no evidence of what items were discovered, how many items were discovered, where these items were discovered, or even a rough estimate of what percentage of searches result in discovery of some sort contraband. Mr. Vesper never even defines what he means by "contraband and other illegal items." And defendants have been unable to identify a single instance in which contraband has been found in an area that would have been concealed by a juvenile's underwear, as opposed to outer clothing.

The record also shows that Yamhill County could employ less intrusive alternatives without undermining its custodial obligations to care for the health and well-being of juvenile

---

[6] Although the Supreme Court has stated that "the logic of such elaborate less-restrictive-alternative arguments could raise insuperable barriers to the exercise of virtually all search-and-seizure powers," *Wolfish*, 441 U.S. at 559 n.40, the Court later held in *Turner* that less intrusive alternatives may be considered as evidence that a prison regulation does not bear a reasonable relationship to penological interests. 482 U.S. at 90-91 ("This is not a 'least restrictive alternative' test . . . . [b]ut if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard.")

detainees. Although Mr. Vesper notes that the YCJDC strip searches have revealed evidence of abuse, self-harm or medical conditions, he identified only a single instance in which a strip search was necessary to uncover a medical condition hidden by a child's underwear. In that case, the medical condition was "a rash below [a juvenile's] waistline and in his groin and buttocks area," which may or may not have been communicable, and may or may not have posed a serious danger to the child's welfare. (Vesper Aff. (#21) ¶¶ 11, 14.) Likewise, while defendants note that strip searches allowed YCJDC personnel to identify a skin disease, evidence of self-mutilation, and bruises on some of the named plaintiffs in this case, each of these medical conditions "could have been discovered without a full strip search" because they were visible on the plaintiff's neck, shoulders, or arms. (F&R (#60) 17-18.) What is missing from defendants' argument is any evidence to suggest that the scope of the YCJDC strip search policy is "not excessively intrusive in light of the age and sex of the [juvenile detainee] and the nature of the infraction," or, in our case, the nature of the interest justifying the search. *See T.L.O.*, 469 U.S. at 342; *see also Redding*, 129 S. Ct. at 2642-43 (holding a strip search in a school unreasonable in the absence of "any indication of danger to students . . . [or] any reason to suppose that [the student] was carrying pills in her underwear").

I acknowledge that a juvenile detention facility may find it necessary to strip search juvenile admittees, and I accept that the Constitution permits the facility do so without reasonable suspicion. But the scope of the detention facility's strip search must account both for the need that justifies the search and the acute vulnerability of the searched child. Although general institutional security concerns may justify a detention facility in conducting a brief strip search to inspect for contraband that would be hidden by a child's underwear, a greater showing of need is

PAGE 19 AMENDED OPINION AND ORDER

required to justify keeping a child undressed to conduct an extensive search of areas that can be searched while the child is partially or fully clothed.

Because a strip search is so much more invasive and potentially harmful than other searches, it must be kept within its allowable use. YCJDC can require its youth to strip only when being strip searched, and not at other times. For those portions of the admissions search that do not require full nudity, a strip search is too intrusive. This includes inspection of the scalp, ears, hands, feet, mouth, and nose. It also includes visual inspection that can be performed while the youth is partially clothed or wearing a robe. The availability of less intrusive alternatives to a highly invasive strip search, combined with a lack of evidence that less intrusive alternatives would undermine defendants' legitimate interests, demonstrates that the extensive scope of the YCJDC strip search policy is an exaggerated response to its legitimate institutional concerns. Accordingly, I hold that the YCJDC policy is unconstitutional in its scope.

## VII.    <u>Qualified Immunity</u>

I find Mr. Loewen and Mr. Vesper are granted qualified immunity from suit because it was not clearly established that the strip searches at YCJDC were unconstitutional. A state official is entitled to qualified immunity unless the court finds that the violated constitutional right was "clearly established" such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001), *abrogated in part on other grounds by Pearson v. Callahan*, ___ U.S. ___, 129 S. Ct. 808 (2009). The Supreme Court has further defined a "clearly established right" as follows:

> The contours of the right must be sufficiently clear that a reasonable official would
> understand that what he is doing violates that right. This is not to say that an official
> action is protected by qualified immunity unless the very action in question has
> previously been held unlawful, but it is to say that in the light of pre-existing law the

PAGE 20 AMENDED OPINION AND ORDER

unlawfulness must be apparent.

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (internal citation omitted). As discussed above, neither the Ninth Circuit nor the Supreme Court has addressed the constitutionality of strip searches in juvenile detention facilities. Case law regarding strip searches in schools and adult prisons is not directly transferrable to this context. In juvenile detention facilities, the tension between the state's obligation to act as a guardian, the state's institutional concerns, and the unique constitutional status of children is not currently susceptible to resolution through clearly established rules. As the law now stands, the reasonableness of a strip search in a juvenile detention facility depends almost entirely on the facts specific to each case. Given the novelty of this issue and the fact-specific nature of the reasonableness inquiry, I find that the unconstitutionality of the YCJDC strip search policy would not have been apparent to defendants. They are therefore entitled to qualified immunity.

**VIII.** <u>**Standing**</u>

I agree with Judge Hubel that the YCJDC policy at issue gives rise to conduct "capable of repetition, yet evading review." *See Gerstein v. Pugh*, 420 U.S. 103, 110 n.11 (1975). Accordingly, plaintiffs have standing to seek injunctive and declaratory relief.

**CONCLUSION**

I adopt Judge Hubel's F&R as my own opinion, to the extent it his analysis is consistent with the views expressed in this opinion and order. Plaintiffs' Motion for Partial Summary Judgment (#24) IS GRANTED IN PART AND DENIED IN PART. Plaintiffs' motion is granted with respect to the constitutionality of the YCJDC policy, and denied with respect to qualified immunity. Defendant's Motion for Summary Judgment (#18) IS GRANTED IN PART AND DENIED IN PART. Defendants' motion is denied with respect to the constitutionality of the

YCJDC policy, granted with respect to qualified immunity, and denied with respect to plaintiffs' standing to seek injunctive relief. Plaintiff's Motion to Strike (#67) is DENIED.

I find resolution of defendants' and plaintiffs' cross-motions for summary judgment involves a controlling question of law as to which there is substantial ground for difference of opinion. I further find an immediate appeal from this order will materially advance the ultimate termination of this litigation. This matter is therefore certified for appeal pursuant to 28 U.S.C. § 1292(b).

IT IS SO ORDERED.

DATED this  4th  day of May, 2010.

/s/ Michael W. Mosman
MICHAEL W. MOSMAN
United States District Court